[No. E051769. Fourth Dist., Div. Two. Oct. 11, 2012.]

TWENTY-NINE PALMS ENTERPRISES CORPORATION, Plaintiff and Respondent, v.
PAUL BARDOS, Defendant and Appellant.

1436

COUNSEL

Lambert & Rogers and Michael Rogers for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard M. Freeman, John A. Yacovelle, Matthew S. McConnell and Bram Hanono for Plaintiff and Respondent.

OPINION

**MILLER, J.**—Plaintiff and respondent Twenty-Nine Palms Enterprises Corporation (Palms), a tribal corporation, sued Cadmus Construction Co. (Cadmus), a sole proprietorship wholly owned and operated by defendant and appellant Paul Bardos (Bardos) (1) to recover money paid to Cadmus, because it alleged Cadmus was an unlicensed contractor (Bus. & Prof. Code, § 7031)[1] and (2) for unfair competition, in that Cadmus allegedly performed work requiring a contractor's license while unlicensed (§ 17200). The trial court granted summary judgment in favor of Palms.

Cadmus raises six contentions on appeal. First, Cadmus asserts section 7031 does not apply to contracts made with a tribal corporation for work done on tribal land. Second, Cadmus asserts the trial court erred by sustaining Palms's objections to Cadmus's evidence "en masse." Third, Cadmus asserts there is a triable issue of fact as to whether it held a valid license. Fourth, Cadmus contends that if it was not properly licensed, then there is a triable issue of fact as to whether it satisfies the substantial compliance requirements. (§ 7031, subd. (e).) Fifth, Cadmus contends Palms is estopped from seeking recovery pursuant to the unlicensed contractor statute (§ 7031). We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A. *Complaint*

The facts in this part are taken from Palms's complaint. Twenty-Nine Palms Band of Mission Indians (the tribe) is a federally recognized Indian tribe. The tribe is sovereign, residing on its reservation in the Coachella area. Palms is a tribal corporation wholly owned and operated by the tribe. (25 U.S.C. § 477.) Palms owns and operates the Spotlight 29 Casino (the casino). Palms and the casino are on the tribe's land in the Coachella area.

---

[1] All subsequent statutory references will be to the Business and Professions Code, unless otherwise indicated.

On or about March 12, 2007, Cadmus submitted a written bid proposal to construct a temporary access road and parking lot for the casino. The bid was in the amount of $751,995. Palms accepted Cadmus's bid. Cadmus performed the work on the tribe's land, where the casino is located. Cadmus finished its work and was paid in full around May 2007; Palms paid Cadmus $751,995. Cadmus first received its contractor's license in October 2007. When Cadmus entered into the construction contract and performed the construction work, it was not a licensed contractor. Palms sought to have Cadmus disgorge the $751,995.

B.   *Answer*

In Cadmus's answer it denied the allegations and raised 14 affirmative defenses, such as substantial compliance, consent, waiver, and unclean hands. Cadmus's answer is primarily composed of legal assertions, without facts.

C.   *Motion for Summary Judgment*

Palms filed a motion for summary judgment on April 1, 2010. Palms argued the undisputed evidence reflected Cadmus acted as a contractor, but was not licensed when it performed the construction work at the casino, and therefore, Palms should prevail and Cadmus should be required to disgorge the $751,995.

The declaration of Darrell Mike (Mike), a member of the Palms board of directors was attached to Palms's motion for summary judgment. Mike declared Palms contracted with Cadmus in March 2007 for construction work related to a temporary access road and parking lot. Mike stated, "A substantial portion of this work took place on an approximately 47 acre lot adjacent to the Tribe's reservation (the 'Adjacent Lot')." Mike denied that the adjacent lot was ever part of the tribe's federally approved reservation land. Mike believed Palms held a temporary easement over the adjacent lot.

Palms also lodged various exhibits in support of its motion for summary judgment. One of the exhibits was a transcript of Bardos's deposition. In the deposition, Bardos stated Cadmus was a general contracting company, and in 2007 it was operating as a general contractor. Cadmus filed its fictitious business name statement with San Bernardino County on April 6, 2007. Cadmus entered into the contract with Palms on March 12, 2007. Bardos believed Cadmus completed its work around the end of June 2007. The State of California issued a contractor's license to Cadmus on October 26, 2007 (license No. 905717).

Cadmus has always been a sole proprietorship, and Bardos has always been the 100 percent owner. Bardos asserted that from April to October 2007

Cadmus was operating under the contractor's license issued to Bardos Construction, Inc. (BCI), (license No. 505220). In 1983, Bardos applied for a contractor's license as an individual doing business as BCI. When asked if Bardos informed anyone at Palms that he was operating under BCI's license, Bardos responded, "I had no obligation to do that. [¶] . . . [¶] I didn't need to. They had private investigators."

Also lodged as an exhibit was the contract between Cadmus and "Spotlight 29 Casino." Term No. 23 of the contract provided, "License: Pursuant to legal requirements, notice is hereby given that contractors are required by law to be licensed and are regulated by the Contractors State License Board. Any questions concerning a contractor may be referred to the Registrar of the Board [w]hose address is . . . ."

Other exhibits included invoices from Cadmus to Palms, and checks from Palms to Cadmus. A fictitious business name statement reflected Bardos filed for Cadmus's fictitious business name on April 6, 2007. The application for Cadmus's contractor's license was dated June 25, 2007, and signed by Bardos. Cadmus's contractor's license reflected an issue date of October 26, 2007. An online printout related to BCI reflected it had an active class B general building contractor's license, which was issued in February 1987.

### D.   *Opposition to Motion for Summary Judgment*

#### 1.   *Declaration*

In a declaration, Bardos asserted he had been a licensed general contractor in California since 1980. In February 2007, Palms hired Bardos to be its representative in regard to the construction of a parking structure near the casino. As the representative, Bardos would help Palms with the selection of architects and engineers; review completed plans; prepare schedules and budgets; interface with local officials to expedite the permit process; assist with drafting and negotiating contracts with contractors, subcontractors, or suppliers; inspect work as it progressed; and review contractor pay applications.

Bardos asserted that during his time as Palms's construction representative, he learned "the Tribe always took the position that California licensing and/or regulatory laws do not apply to the Tribe and/or work being performed on Tribal lands," which was why local building inspectors did not inspect the construction work and Palms hired BCI to inspect the work.

In his declaration, Bardos explained that Worth Group had been hired as the general contractor for the parking structure project. Palms asked BCI to

prepare a bid for the temporary parking lot and access road, in order to replace Worth Group, which had prepared a bid $1 million higher than BCI's bid. Bardos declared Palms asked BCI to perform the work under a different name, to hide the fact that Bardos—Palms's representative—was performing the construction work, i.e., self-dealing. Bardos created Cadmus to hide his dual role. Bardos said Palms was "fully informed" BCI's contractor's license would be used for the work on the temporary parking lot and access road, through conversations with Bardos. Mike told Bardos construction work on tribal land was exempt from state licensing requirements.

Bardos declared Palms made payments to Cadmus, which Bardos then funneled to BCI, in order to pay subcontractors. Bardos explained that he did not immediately seek a contractor's license for Cadmus because he relied on Palms's representation Cadmus did not need a license for work done on tribal land.

Bardos further declared the written agreement between Cadmus and Palms only encompassed a portion of the work performed, because at the time the written contract was created Palms was still trying to gain an easement across the adjacent lot. According to Bardos, the written agreement had two parts: the first part concerned constructing the access road, while the second part concerned construction of the temporary parking lot. Bardos declared that, at the time of signing the written contract, the tribe had not yet acquired a temporary easement across the adjacent lot so the access road could be built. Thus, Mike struck out the first part of the contract, only agreeing to the second part related to the parking lot. Bardos stated the work related to the access road was eventually completed pursuant to collateral oral agreements.

### 2. *Opposition*

Cadmus filed its corrected opposition to Palms's motion for summary judgment on June 4, 2010. In the opposition, Cadmus set forth its version of the facts. Cadmus asserted the general contractor on the casino renovation project was Worth Group. Palms asked BCI how much it would charge to perform the work on the temporary access road and parking lot. BCI responded that it could perform the work for less money than Worth Group. Palms then asked Bardos, the managing officer and sole shareholder of BCI "to perform the [construction] work under a different name so that Worth [Group] would not discover that BCI . . . was the one performing the work." In order to accommodate Palms, Bardos created the fictitious business name " 'Cadmus Construction Company.' " The fictitious business name was designed to conceal BCI's identity from Worth Group, so it would not object to BCI's dual role as Palms's representative on the project and as a contractor on the project.

Cadmus asserted Palms performed an extensive background check on Bardos including a status review of BCI's contractor's license. Further, Cadmus argued Palms "expressly and impliedly approved of BCI's licensure as being sufficient to support its purported agreement with Cadmus. [Citation.] [Palms] even went so far as to represent to Cadmus that it did not require Cadmus to have its own contractor's license, but that the work could be performed under BCI's license because it was being performed on the Tribe's land." Cadmus alleged Palms knew BCI would be performing the work, but insisted BCI and Bardos maintain the illusion Cadmus was performing the work, so Worth Group would not discover BCI's dual role. Cadmus argued Palms should be barred from recovering disgorged profits due to the doctrine of unclean hands.

Further, Cadmus asserted the written contract did not cover all of the construction work. Cadmus argued some of the work was performed subject to oral agreements between Palms and BCI. Cadmus argued the checks for the construction work were made payable to Cadmus solely for Palms's convenience, and to maintain the illusion that Cadmus was performing all the work. Cadmus argued summary judgment should not be granted because some of the money was earned by BCI pursuant to the oral agreements.

Further, Cadmus asserted civil regulatory laws do not apply on tribal lands. (28 U.S.C. § 1360.) Cadmus reasoned the state trial court lacked jurisdiction to decide the issue, if section 7031 is determined to be a civil regulatory statute, as opposed to a criminal statute. Cadmus then argued that section 7031 is a civil regulatory law because it is a regulatory licensing rule. Additionally, Cadmus asserted a triable issue of fact existed as to whether Palms waived the licensing requirement, which it could do pursuant to its sovereign immunity.

Finally, Cadmus argued the motion for summary judgment should be denied because additional facts exist, and Cadmus should be permitted to conduct further discovery. Cadmus asserted it did not have a reasonable opportunity to conduct discovery because after Cadmus filed its answer, but before the summary judgment motion was filed, Cadmus's insurance company disclaimed Cadmus's coverage, which caused Cadmus to spend time evaluating whether it would keep the insurance company's attorney or retain new counsel. Cadmus contended it could produce additional evidence related to triable issues of fact if given more time for discovery.

### 3. *Exhibits*

Cadmus lodged a variety of exhibits in support of its opposition to the motion for summary judgment. One of the exhibits was a Contractors' State

License Board certification of records reflecting Bardos Construction Company (BCC) was issued a class B general contractor's license in 1980.

Another exhibit was the "Consulting Services Agreement" (the consulting agreement) between Palms and "Paul Bardos, dba Bardos Construction, Inc.," dated February 1, 2007. The consulting agreement provided BCI would act as Palms's representative for (1) the development and construction of a Kampgrounds of America facility, (2) the development and construction of a parking structure adjacent to the casino, and (3) renovations to the casino related to the parking structure. The representative position included assisting in the selection of architects and engineers; reviewing completed plans; preparing schedules and budgets; interfacing with local officials to expedite the permit process; assisting with drafting and negotiating contracts with contractors, subcontractors, or suppliers; inspecting work as it progressed; and reviewing contractor's pay applications.

Included in the exhibits was a City of Coachella building permit for work done on the temporary road and parking lot taken in the name of "Bardos Construction" in April 2007. Also included was an agreement between BCI and Laird Construction, for Laird to perform subcontracting work on the temporary road and parking lot. The agreement listed the general contractor as BCI. The subcontracting agreement reflected Laird would construct the temporary access road and parking lot for $396,649.

E. *Reply to the Opposition to Summary Judgment*

In Palms's reply to Cadmus's opposition, it raised a variety of arguments. First, Palms contended Bardos's declaration contradicted his deposition testimony. Specifically, Bardos contradicted himself by declaring that part I of the contract, related to the access road, was not part of the written agreement. Palms asserted that during Bardos's deposition, he testified the written contract was the only agreement for construction between Palms and Cadmus. Bardos testified, "Cadmus Construction Company completed its scope of work under this agreement," referring to the written contract. Palms further argued the evidence reflected payments for the road construction corresponded exactly to those set forth in the written contract. Palms also argued Bardos contradicted himself by claiming he had conversations with tribal members about using BCI's license to perform the construction work. In Bardos's deposition, when asked if he ever informed a tribal representative that Cadmus was using BCI's license, Bardos responded, "I had no obligation to do that."

Second, Palms asserted Cadmus failed to produce evidence that it was a licensed contractor when it performed the construction work. Third, Palms

argued the written contract encompassed all the work performed, so there were no collateral agreements with BCI. Fourth, Palms contended the trial court found it had jurisdiction over the case during the demurrer stage of the proceedings, so Cadmus should not be permitted to reargue the jurisdiction issue.

Fifth, as to waiver, Palms argued Cadmus provided no authority that Palms could waive state licensing requirements. Palms asserted section 7031 was criminal in nature and therefore "may be enforced on the Tribe's reservation, without regard to the Tribe's wishes. [Citation.]" Palms further argued the express terms of the written contract reflected contractors must be properly licensed. Palms concluded Cadmus's case law did not support the application of affirmative defenses in situations involving unlicensed contractors, e.g., unclean hands, estoppel, waiver, and fraud.

Sixth, in regard to Cadmus's request for more time to conduct discovery, Palms argued Cadmus did not meet the statutory requirements for a continuance. Palms argued Cadmus failed to provide a declaration explaining why the discovery was not previously conducted—the explanation was in the opposition, but not a declaration. Further, Palms asserted Cadmus had not conducted any discovery as of June 2010, despite being served with the complaint in October 2009. Palms asserted Cadmus was only trying to delay the proceedings by requesting more time for discovery. Palms filed 39 objections to the evidence Cadmus provided in support of its opposition.

F.  *Surreply to the Reply in Support of the Motion for Summary Judgment*

Cadmus filed a surreply to Palms's reply. Cadmus asserted Bardos never testified that the written agreement covered all the construction work performed. Further, Cadmus asserted Bardos testified that members of the tribe asked Bardos to conceal the fact that BCI was performing the construction, and Bardos supplemented his testimony after the deposition to reflect that he spoke to tribal members about Cadmus using BCI's license. Additionally Cadmus argued that the written contract showed Mike wrote " 'Part II only' " above the signature lines, indicating that part I was deleted from the written contract. Cadmus asserted the motion for summary judgment should not be granted because the written agreement did not cover all of the construction work, so some work was done directly between Palms and BCI.

G.  *Hearing*

On June 17, 2010, the trial court held a hearing on Palms's summary judgment motion. At the hearing, Palms argued its motion was primarily

based on Bardos's testimony and invoices reflecting Cadmus was paid in the exact amounts set forth in the written agreement. Palms asserted the burden was on Cadmus to show it had a contractor's license during the period of construction, and Cadmus had not provided proof of a license.

Cadmus argued the written agreement did not cover all the construction work performed. Cadmus further asserted Palms paid Cadmus, as opposed to BCI, because Palms chose to conceal BCI's identity from Worth Group. Cadmus argued it was "unbelievable" for Palms to argue Cadmus was wrong to perform the construction work without a license, because Palms, Cadmus, BCI, and Bardos all agreed to conceal Bardos's and BCI's dual roles. Further, Cadmus asserted a contractor's license was not required to perform the construction work on the tribe's land.

The trial court found Cadmus did not have a contractor's license at the time it performed the construction work, and therefore, Palms was entitled to a judgment against Cadmus in the amount of $751,995. As to substantial compliance, the trial court explained there was no evidence of sharing BCI's license, and "using such [a] license is legally barred as a basis for substantial compliance."

As to who performed the work, the trial court pointed out (1) Cadmus submitted the construction bid; (2) Palms accepted the bid without any changes; (3) Cadmus hired Laird to perform the construction work; (4) Cadmus completed the work within the scope of the contract by the end of June 2007; (5) Cadmus invoiced Palms for the entire written contract amount; (6) Palms paid Cadmus the full contract price; and (7) Cadmus was not issued a contractor's license until October 26, 2007.

The trial court cited the rule that a party cannot create a triable issue of fact by contradicting its own prior discovery responses. Thus, the trial court reasoned Bardos's declaration must be rejected in favor of Bardos's deposition testimony. As a result, the trial court concluded Cadmus had not disputed any of Palms's facts. The trial court also found Cadmus had not contradicted any of Palms's legal authority related to licensing laws, disgorgement laws, and the unavailability of substantial compliance. The trial court concluded Cadmus had not provided any legal authority for its arguments related to waiver, estoppel, or unclean hands. The court found Cadmus's request for additional time failed because the request was not supported by affidavits or declarations.

As to Palms's objections to Cadmus's evidence, the trial court said, "The Court is sustaining [Palms's] objections to defendant's evidence." Cadmus responded, "Your Honor indicated that the Court was sustaining [Palms's]

objections to Cadmus' evidence. All of the objections?" The court said, "Yes." The trial court granted Palms's motion for summary judgment.

## DISCUSSION

### A. *Section 7031*

Cadmus asserts the unlicensed contractor statute (§ 7031) is not enforceable in a contract made with a tribal entity for work done on tribal land. We disagree because Cadmus cannot assert Palms's sovereign immunity.

Cadmus's contention is purely legal; therefore, we apply the independent standard of review. (*Ferguson v. City of Cathedral City* (2011) 197 Cal.App.4th 1161, 1167 [128 Cal.Rptr.3d 514] [Fourth Dist., Div. Two].)

In *Three Affiliated Tribes v. Wold Engineering* (1984) 467 U.S. 138, 148 [81 L.Ed.2d 113, 104 S.Ct. 2267] (*Three Tribes*), the United States Supreme Court concluded the situation of an Indian suing a non-Indian in state court is "very different" from a non-Indian suing an Indian in state court for events occurring on tribal land. The United States Supreme Court explained, "As a general matter, tribal self-government is not impeded when a State allows an Indian to enter its courts on equal terms with other persons to seek relief against a non-Indian concerning a claim arising in Indian country." (*Id.* at pp. 148–149.)

In *State of Arizona v. Zaman* (1997) 190 Ariz. 208 [946 P.2d 459] (*Zaman*), a mother, who was a member of the Navajo tribe, brought an action in Arizona state court against her child's father (Zaman), who was not a member of an Indian tribe. (*Id.*, 946 P.2d at p. 460.) The mother sought to have Zaman adjudged the child's father and ordered to pay child support. (*Ibid.*) Zaman argued the trial court lacked jurisdiction. The trial court found in favor of the mother, but the intermediate appellate court reversed. The intermediate court held the trial court "lacked subject matter jurisdiction because 'state action [would] infring[e] on the right of reservation Indians to make their own laws and be ruled by them.' [Citation.]" (*Ibid.*)

The Arizona Supreme Court vacated the intermediate appellate court's decision. (*Zaman, supra*, 946 P.2d at p. 464.) The Arizona Supreme Court reasoned, "Zaman, a non-Indian, seeks to use a protection afforded Indians to defeat the claim of an Indian who chooses the state forum. This attempt to clothe oneself in the immunity afforded another has already been rejected by the Supreme Court. [*Three Tribes, supra*], 467 U.S. at 148 . . . ." (*Zaman, supra*, 946 P.2d at p. 461.)

■ *Zaman* and *Three Tribes* reflect that the sovereign immunity defense is reserved for the tribe and its entities. Thus, if a tribe or a tribal entity seeks to sue a nontribal entity in state court, then the nontribal entity cannot assert a sovereign immunity defense. As the United States Supreme Court explained, a tribal entity selecting a state forum is "very different" from a tribal entity being brought as a defendant to a state forum. (*Three Tribes, supra*, 467 U.S. at p. 148.) The difference, as identified in *Zaman*, is that the sovereign immunity defense is only available to the tribe and its entities.

Since the sovereign immunity defense is only available to the tribe and the tribal entities, the defense was not available to Cadmus—a nontribal entity. Thus, Cadmus cannot rely on the defense theory that section 7031 was not enforceable in a contract made with a tribal entity for work done on tribal land, because that defense relies on principles of sovereign immunity. For example, in Cadmus's opening brief, it argues, "[I]t is also well established that building and zoning codes are not operative on Tribal property because of sovereignty interference . . . ." Cadmus further argues, "The interference with Indian sovereignty of licensing requirements is illustrated in this case: Had Cadmus been forced to obtain a new license prior to commencing work, [then] the Tribe would have had to choose between selecting another contractor or delaying the start of construction . . . ." Cadmus is asserting the tribe's sovereign immunity to prevent the tribe from pursuing an action against him in state court. Cadmus cannot do this—the sovereign immunity defense is reserved for the tribe and tribal entities. Accordingly, we conclude the trial court did not err.

Cadmus does not provide a detailed explanation as to why it is authorized to assert tribal sovereign immunity as a defense. In Cadmus's opening brief, it writes, "Palms seeks disgorgement of monies paid to Cadmus for work done on Indian property . . . ." It appears Cadmus is asserting the following theory: Section 7031 simply was not the law in the jurisdiction where the contract performance took place. The problem with this argument is that it relies on principles of sovereign immunity. Cadmus is arguing a particular state law does not apply on tribal lands—Cadmus does not have the authority to assert this defense, only the tribe or its entities may assert such a defense. Cadmus cannot raise tribal immunity simply because the contract was performed on tribal land—the defense of sovereign immunity is personal to the tribe and its entities. (*Zaman, supra*, 946 P.2d at p. 461; *Three Tribes, supra*, 467 U.S. at p. 148.) Accordingly, we find Cadmus's argument to be unpersuasive.

Cadmus provides an argument as to whether section 7031 is civil in nature or criminal in nature. Cadmus asserts the statute is a civil regulatory statute and therefore does not apply on tribal land. Since we have concluded Cadmus

cannot rely on the sovereign immunity defense, we do not address the merits of Cadmus's sovereign immunity argument.[2]

## B. *Evidentiary Objections*

Cadmus contends the trial court erred by summarily sustaining all of Palms's 39 evidentiary objections, because some of the objections were unreasonable and it appears the trial court did not consider the individual objections. We agree.

We apply the abuse of discretion standard when reviewing the trial court's rulings on evidentiary objections. (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 [59 Cal.Rptr.3d 618].) Summarily ruling on multiple evidentiary objections "has been criticized by many [appellate] courts." (*Tilley v. CZ Master Assn.* (2005) 131 Cal.App.4th 464, 479 [32 Cal.Rptr.3d 151].) When a trial court issues a blanket ruling on numerous evidentiary objections without providing any reasoning, there "is hardly a ruling, as it could not provide any meaningful basis for review." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 [100 Cal.Rptr.3d 296].) When a trial court issues such a ruling, the "appellate court[] [is] left with the nebulous task of determining whether the ruling that was purportedly made was within the authority and discretion of the trial court and was correct." (*Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235 [114 Cal.Rptr.2d 151].)

Although summarily ruling on numerous evidentiary rulings is a common labor-saving practice in law and motion courts, the objections in this case needed individual attention. (See *Sambrano v. City of San Diego, supra*, 94 Cal.App.4th at p. 235 ["common practice"].) Bardos submitted a seven-page declaration, excluding the signature and proof of service pages. Palms submitted 33 objections to that seven-page declaration, and the 33 objections were 48 pages in length. The objections were often to large sections of the deposition—multiple lines long—and were based on a variety of alleged problems, such as lack of foundation, vagueness, speculation, and lack of personal knowledge.

For example, objection No. 1 was based on the following paragraph from Bardos's declaration: " 'On or about August 1980, I personally became a licensed "B" General Building Contractor in the State of California doing business as the sole owner and proprietor ·of [BCC], contractor's license

---

[2] On December 12, 2011, Cadmus requested this court take judicial notice of the " 'Tribal-State Compact between the State of California and the Twenty-Nine Palms Band of Mission Indians,' " related to casino gambling. The compact was intended to support Cadmus's sovereign immunity argument. Since we are not addressing the merits of Cadmus's sovereign immunity argument, we deny Cadmus's request for judicial notice.

number 392817. A true and correct copy of the certification of licensure for [BCC] is lodged concurrently herewith as Exhibit "A." Since 1980, I have been at all times and without interruption, a licensed General Building Contractor in California. At the present time I currently hold active licenses for both Cadmus Construction, Inc.[3] (issued October 26, 2007) and [BCI] (issued February 6, 1987) under license numbers 905717 and 505220. True and correct copies of the certification of licensure for [CCI] and [BCI] are lodged concurrently herewith as Exhibits "B" and "C" respectively. Both licenses have always been active and in good standing without ever lapsing and without any disciplinary action taken against them. [Citation.]' " (Boldface omitted.)

Palms objected to the foregoing paragraph on the bases of (1) irrelevance, (2) lack of foundation, and (3) misstating the evidence. Palms argued that BCI and CCI "are not parties to this case and their licensure is irrelevant." First, as to relevancy, it is unclear how the evidence would be irrelevant, since (1) Palms raised the substantial compliance issue in its motion for summary judgment, specifically arguing about Cadmus's use of BCI's license, and (2) Cadmus could try to use the various other licenses to prove substantial compliance. Second, as to lack of foundation, it appears the paragraph is attempting to lay the foundation for the various licenses being lodged as evidence, so it is unclear exactly what foundation is missing for the testimony. Third, as to misstating the testimony, Palms points out that BCC's license has been inactive since 1988. The problem with this objection is that Bardos declared BCI's and CCI's licenses have always been active—not BCC's license. So there does not appear to be a misstatement of the evidence. In sum, it appears unreasonable for the trial court to have sustained this objection.

Objections Nos. 34 through 39 related to Cadmus's exhibits. Palms asserted the various documents Cadmus presented were problematic, mostly due to the exhibits being irrelevant. For example, in objection No. 34, Palms objected to BCC's certificate of licensure on the basis of irrelevancy. Palms argued the certificate was irrelevant because BCC was not a party to this case. Contrary to Palms's assertion, BCC's license is relevant to Cadmus trying to establish substantial compliance with the licensing statutes. As will be explained in greater detail *post*, with BCC's license, Cadmus could try to prove Bardos, and therefore, Cadmus (as a sole proprietorship) had been duly licensed as a contractor in this state prior to the performance of the act or contract. Thus, it was not reasonable to sustain the objection on the basis of the exhibit being irrelevant.

---

[3] The appellant in this case is Cadmus Construction Co., not Cadmus Construction, Inc. (CCI).

Given the sweeping nature of the objections (48 pages of objections to a seven-page declaration, numerous lines of the declaration being used in almost every objection, and multiple bases for each objection), and the problematic nature of some of the objections, as set forth *ante*, we conclude the trial court's blanket ruling sustaining all the objections, without reasoning, was an abuse of discretion. (See *Nazir v. United Airlines, Inc., supra*, 178 Cal.App.4th at p. 257 ["order sustaining all but one of defendants' objections was a manifest abuse of discretion."].) Thus, the objected-to evidence will be used in reviewing the trial court's ruling on the summary judgment motion. (*Ibid.*)

In regard to whether the evidentiary ruling was harmless, an erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. [Citation.]" (*Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 815 [50 Cal.Rptr.3d 731]; see Evid. Code, § 354.) In the instant case, the error in the trial court's evidentiary rulings would not change the outcome on the summary judgment motion because Cadmus failed to present any evidence creating a triable issue of fact, as will be explained *post*.

### C. License

Cadmus asserts the trial court erred by granting summary judgment because there is evidence Cadmus was licensed.

"We review a grant of summary judgment de novo. [Citation.] We assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers so that all doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. [Citation.]" (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 160–161 [89 Cal.Rptr.3d 495].)

■ The Contractors' State License Law, "section 7000 et seq., requires contractors to be licensed unless they are exempt from licensure. (§§ 7026, 7031, 7040 et seq.)" (*Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 700 [126 Cal.Rptr.3d 743] (*Ball*).) Section 7031, subdivision (a), requires a person to be "a duly licensed contractor at all times during the performance of th[e] act or contract," when "engaged in the business or acting in the capacity of a contractor." Section 7031, subdivision (b), provides that an unlicensed contractor must disgorge all compensation earned under a contract. Section 7059.1, subdivision (b), provides, "A licensee shall not conduct business under more than one name for each license."

However, "[a] sole owner is a sole proprietorship and a sole proprietorship is not a legal entity separate from its individual owner." So, for example, if

"Smith Heating" is a sole proprietorship owned by Smith, then Smith Heating cannot hold a contractor's license independent from Smith. Smith Heating would not be a distinct legal entity—it is the individual, Smith, who is the licensee, and under that license Smith can perform work under the name Smith Heating. (*Ball, supra,* 196 Cal.App.4th at p. 701.)

■ Cadmus has always been a sole proprietorship, and Bardos has always been the 100 percent owner. Bardos asserts his role as the responsible managing officer of BCI makes BCI's license the equivalent of an individual license for Bardos, and thus, allows Bardos to perform work under Cadmus's name.[4] The problem with Cadmus's argument is that BCI, a corporation, is a separate legal entity from Bardos and Cadmus. (See *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 150 [6 Cal.Rptr.3d 7] ["Generally, 'a corporation is a distinct legal entity, separate from its shareholders and officers.' "].) The fact that Bardos is the responsible managing officer for BCI does not dissolve BCI's corporate status—BCI is its own legal entity. (*Ibid.*) Thus, Bardos did not hold an individual license under BCI's name such that he could perform work under Cadmus's name.

Cadmus contends the corporate identity of BCI should be disregarded via the alter ego doctrine or piercing the corporate veil. Palms contends Cadmus waived the alter ego argument by not raising it below. "The appellate court can deem an argument raised in an appeal from a grant of summary judgment waived if it was not raised below and requires consideration of new factual questions." (*Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488 [33 Cal.Rptr.3d 111].) We agree that the argument is waived for failure to raise it below. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072 [130 Cal.Rptr.3d 123] [" '[T]he determination of whether a corporation is an alter ego of an individual is ordinarily a question of fact.' "].)

---

[4] The following is the law related to responsible managing officers. Former section 7068, subdivision (a), provided, "The board shall require an applicant to show such degree of knowledge and experience in the classification applied for, and such general knowledge of the building, safety, health, and lien laws of the state and of the administrative principles of the contracting business as the board deems necessary for the safety and protection of the public." (Eff. Jan. 1, 2005, through Dec. 31, 2010.) Former section 7068, subdivision (b)(3), provided, "An applicant shall qualify in regard to his or her experience and knowledge in one of the following ways: [¶] . . . [¶] (3) If a corporation, or any other combination or organization, it shall qualify by the appearance of a responsible managing officer or responsible managing employee who is qualified for the same license classification as the classification being applied for." (Eff. Jan. 1, 2005, through Dec. 31, 2010.) Former section 7068, subdivision (e), provided, "Except in accordance with Section 7068.1, no person qualifying on behalf of an individual or firm under paragraph . . . (3) of subdivision (b) shall hold any other active contractor's license while acting in the capacity of a qualifying individual pursuant to this section." (Eff. Jan. 1, 2005, through Dec. 31, 2010.)

Cadmus contends "the words 'alter ego' may not have been uttered in the trial court, [but] the idea certainly was. The idea that Appellant's existing licensed corporation could not be used to do the work because the Tribe wanted to hide its identity was argued ad nauseum." The problem with this argument is that the alter ego doctrine requires consideration of numerous factors, so a discussion of a general idea is not sufficient. For example, a few of the factors that must be considered are (1) whether there was commingling of funds; (2) whether the individual treated corporate assets as his own; and (3) whether the individual held himself out as being personally liable for the debts of the corporation. (*Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 512–513 [121 Cal.Rptr.3d 118] [listing 14 factors] (*Greenspan*).) There is a lengthy list of other factors to be considered when deciding whether the corporate veil should be pierced, so a general discussion will not suffice as having raised the issue below.

■     Another threshold issue to discuss is the equitable nature of the alter ego doctrine. " '[I]t has long been settled that "the courts may not resort to equitable considerations in defiance of section 7031." [Citation.]' " (*Montgomery Sansome LP v. Rezai* (2012) 204 Cal.App.4th 786, 794 [139 Cal.Rptr.3d 181]; see *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 423 [30 Cal.Rptr.3d 755, 115 P.3d 41] (*MW Erectors*).) The alter ego doctrine is equitable in nature. (*Greenspan, supra*, 191 Cal.App.4th at p. 508.) Thus, using the alter ego doctrine to allow Cadmus to borrow BCI's license would be improper, because it is an equitable doctrine.

Despite the foregoing, we will address the merits of Cadmus's contention. " 'The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. . . . In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation: "As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation." . . .' " (*Greenspan, supra*, 191 Cal.App.4th at pp. 510–511.)

Cadmus is trying to pierce the corporate veil of BCI to obtain BCI's contractor's license, in order to circumvent the state's licensing statutes. The alter ego doctrine was not created to circumvent regulatory requirements; it was founded on equitable principles and designed to prevent an injustice. (*Greenspan, supra*, 191 Cal.App.4th at p. 512.) In the instant case, Cadmus

admits its corporate form was created by Bardos for the purpose of self-dealing. Bardos was entrusted with hiring contractors and overseeing their work, and he hired himself in the form of Cadmus. Cadmus worked without a license, and now wants to pierce the corporate veil of BCI to borrow its contractor's license. We fail to see how equity requires the piercing of BCI's corporate veil in order to remedy an injustice in this case, because Cadmus is only trying to pierce BCI's corporate veil to further Bardos's self-dealing. (See *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446 [99 Cal.Rptr.2d 678] [" 'One who comes into equity must come with clean hands.' "].)

### D. *Substantial Compliance*

Cadmus contends that if it was not properly licensed, then there is evidence it fulfilled the substantial compliance requirements. We disagree.

Palms contends Cadmus waived the substantial compliance argument by not raising it at the trial court. Cadmus asserts it can argue the theory on appeal, because in Palms's motion for summary judgment, Palms argued "any attempt by Cadmus . . . to utilize the doctrine of substantial compliance is without merit." Since the issue was raised in the motion for summary judgment we will address the merits of the contention.

██ "Section 7031, subdivision (e), provides the sole exception to the contractor's licensure requirements." (*WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 588 [76 Cal.Rptr.3d 8].) It permits a court to find there has been "substantial compliance with licensure requirements . . . if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, (3) did not know or reasonably should not have known that he or she was not duly licensed when performance of the act or contract commenced, and (4) acted promptly and in good faith to reinstate his or her license upon learning it was invalid." (§ 7031, subd. (e).)

As to the first factor, Cadmus was not licensed in the State of California prior to the construction. However, Cadmus was a sole proprietorship, and Bardos was the 100 percent owner. "[A] sole proprietorship is not a legal entity separate from its individual owner." So, an individual's contractor's license can be used to perform work in the name of the sole proprietorship. (*Ball, supra*, 196 Cal.App.4th at p. 701.) BCC was a sole proprietorship owned by Bardos. BCC was issued a contractor's license in 1980; however,

the license became inactive in 1988. Since Bardos previously had a contractor's license in the name of BCC, a sole proprietorship, then he arguably had been licensed prior to the work performed for Palms.

As to the second factor—acting reasonably and in good faith to maintain proper licensure—there is nothing indicating Cadmus tried to maintain or obtain a proper license until the end of the construction. The construction contract was dated March 12, 2007. The construction was completed around the end of June 2007. Cadmus applied for a contractor's license in its name on June 25, 2007. Cadmus entered into a contract and was nearing completion of the contract before it applied for a license. Thus, it appears the second requirement is not satisfied because Cadmus did not reasonably and in good faith maintain a proper license—it waited until construction was nearly completed to submit an application for a license.

Cadmus contends it satisfied the second requirement because BCI maintained an active license and Palms told Cadmus it did not need a contractor's license to perform work on tribal land. The problem with Cadmus's argument is that BCI is its own distinct legal entity. Therefore, the fact that BCI held a license does not show Cadmus was acting reasonably and in good faith to maintain proper licensure—they are two separate entities.

Further, Bardos's evidence that Palms informed him a license was not needed is contradicted by Bardos's testimony and Cadmus's license application. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1120 [75 Cal.Rptr.2d 27] [A party cannot evade summary judgment by creating its own contradictions in the evidence.].) At his deposition, when Bardos was asked if he informed anyone at Palms that he was operating under BCI's license, he responded, "I had no obligation to do that. [¶] . . . [¶] I didn't need to. They had private investigators." Bardos's testimony reflects Cadmus's license status was not a topic of conversation. Bardos's assertion is further contradicted by his license application dated June 25, 2007. Bardos stated Cadmus was created solely for the sake of hiding his self-dealing from Worth Group, and Cadmus has only ever performed work for Palms. Thus, Cadmus's application for a license reflects a belief that a license was needed for work on tribal land, because Cadmus never worked for anyone other than Palms. Accordingly, Bardos's own statements and Cadmus's license application contradict Cadmus's assertion that it acted in good faith because it did not believe it needed a license.

In the third factor, it must be shown that the contractor "did not know or reasonably should not have known that he or she was not duly licensed when performance of the act or contract commenced." (§ 7031, subd. (e).) Bardos stated that he knew Cadmus did not have the appropriate license, and he

believed Cadmus was operating under BCI's license. Thus, Cadmus was aware it did not have a license, because it was attempting to share a license with a different entity—BCI. Accordingly, the third factor is not satisfied, because it requires Cadmus to *not* know that it was unlicensed; in this case, Cadmus knew it was unlicensed.

Cadmus sets forth the following argument related to the third factor: "[Cadmus] was operating under the reasonable belief that a license was not required for this work. If a license was not required, then he was duly licensed." Cadmus is missing the thrust of the third requirement, which is, did the contractor not know it was unlicensed? The evidence reflects Cadmus knew it was unlicensed prior to commencing work for Palms. In Bardos's declaration, he explained he did not seek a license for Cadmus prior to starting the construction work because Palms requested Cadmus "immediately commence work." Given the evidence, we are not persuaded Cadmus was unaware that it was unlicensed.

The fourth factor is concerned with whether Cadmus acted promptly and in good faith to reinstate its license upon learning it was invalid. (§ 7031, subd. (e).) Cadmus's construction contract is dated March 12, 2007. The construction was completed around the end of June 2007. Cadmus applied for a contractor's license in its name on June 25, 2007. Cadmus knew when it began performing the construction work that it was unlicensed, but it waited for months and until the construction work was nearly completed to apply for a license. Thus, the evidence reflects Cadmus did not act promptly to obtain its license.

Cadmus asserts it acted promptly by trying to reactivate BCC's license. In Bardos's declaration, he declared, "I submitted an application to extend the active license for [BCC] to create a new license for Cadmus . . . prior to June 25, 2007." A "Certification of Records" related to BCC's contractor's license, covering the period from January 1, 1983, through January 12, 2010, reflects BCC's license became inactive in 1988 and remained inactive through January 12, 2010. There is nothing indicating that BCC's license was reactivated in 2007. Thus, it is unclear exactly when Cadmus tried to activate a license, if not June 25, 2007. Accordingly, we find Cadmus's argument to be unpersuasive.

In sum, there is not a triable issue of fact on the issue of substantial compliance. There is not a triable issue of fact related to the second factor because there is nothing indicating Cadmus acted reasonably and in good faith to maintain proper licensure. There is not a triable issue of fact related to the third factor because the evidence reflects Cadmus knew it was unlicensed. There is not a triable issue of fact for the fourth factor because the evidence reflects Cadmus did not act promptly to obtain its license.

### E. *Estoppel*

Cadmus contends Palms should be estopped from relying on section 7031, because Palms told Cadmus state licensing laws did not apply to their transaction. We disagree.

Cadmus relies on the following rule: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid. Code, § 623.) The foregoing rule is a codified portion of the equitable estoppel doctrine. (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 186–187 [104 Cal.Rptr.3d 508].) As set forth *ante*, equitable principles may not be used to circumvent Business and Professions Code section 7031. (*Montgomery Sansome LP v. Rezai, supra*, 204 Cal.App.4th at p. 794; see *MW Erectors, supra*, 36 Cal.4th at p. 423.) As a result, Cadmus may not rely on the codified equitable estoppel doctrine to defeat summary judgment.

Nevertheless, if Cadmus could rely on equitable estoppel, we would disagree with the merits of the argument. Cadmus contends Palms informed Cadmus it did not need a contractor's license due to the tribe's sovereign immunity. The flaw in Cadmus's argument is that the conflict in the evidence on this point is created by Bardos himself. (See *Guthrey v. State of California, supra*, 63 Cal.App.4th at p. 1120 [A party cannot evade summary judgment by creating its own contradictions in the evidence.].)

At his deposition, when Bardos was asked if he informed anyone at Palms that he was operating under BCI's license, he responded, "I had no obligation to do that. [¶] . . . [¶] I didn't need to. They had private investigators." This evidence contradicts an assertion that Cadmus's license was a topic of conversation. The claim is further contradicted by the evidence that Cadmus applied for a contractor's license on June 25, 2007. Bardos stated Cadmus was created solely for the sake of hiding his self-dealing from Worth Group, and Cadmus has only ever performed work for Palms. If Cadmus only ever performed work for Palms, then Cadmus had to know a license was needed to work for Palms, otherwise it would not have applied for a license since Cadmus only existed to hide Bardos's self-dealing while working for Palms. Thus, the evidence reflects there is not a triable issue related to equitable estoppel because the contradictions in the evidence were created by Bardos and Cadmus.

## DISPOSITION

The judgment is affirmed. Twenty-Nine Palms Enterprises Corporation is awarded its costs on appeal.

Richli, Acting P. J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 20, 2013, S207414.