Filed 11/14/23  Choi v. Huang CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSEPH CHOI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>AMY HUANG,<br><br>    Defendant and Respondent. | B313614<br><br>Los Angeles County<br>Super. Ct. No.<br>20STCV31030 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed.

Lowe & Associates and Steven T. Lowe for Plaintiff and Appellant.

Lesowitz Gebelin and Steven T. Gebelin for Defendant and Respondent.

# INTRODUCTION

Plaintiff Joseph Choi, a freelance photographer and former manager of a social network for young Asian creatives, sued defendant Amy Huang, a fashion student, for libel per se, slander per se, and false light after Huang accused Choi of sexual misconduct and emotional abuse. The court granted Huang's special motion to strike Choi's complaint under Code of Civil Procedure[1] section 425.16 (anti-SLAPP statute). Choi appeals, arguing none of Huang's statements that give rise to his defamation and false light claims constitute protected speech and, in any event, he demonstrated his claims have minimal merit. We affirm.

## FACTS AND PROCEDURAL BACKGROUND[2]

### 1. Huang's Relationship With Choi

In January 2019, Huang was 19 years old and attending the Fashion Institute of Design and Merchandising in Los Angeles. She had recently joined the Los Angeles chapter of the Asian Creative Network (ACN), a Facebook group for "Asian millennials in their 20's." The group was created to be a

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] We grant the parties' joint motion to augment the record with the following documents that were submitted in the trial court but inadvertently omitted from the clerk's transcript: (1) eight exhibits attached to Huang's declaration; (2) a notice of errata filed by Huang that includes her declaration and 11 attached exhibits, several of which were inadvertently not attached to her original declaration; and (3) Choi's objections to Huang's evidence filed in support of her anti-SLAPP motion.

professional networking platform and to "connect, empower, and elevate Asian creatives." At the time, ACN had around 45,000 members nationwide, with between 1,000 and 4,000 of those members belonging to the group's Los Angeles chapter.

In late January 2019, Huang met Choi at a party hosted by Michelle Chan, a mutual friend and founding member of ACN's Los Angeles chapter. Huang and Choi exchanged contact information and friended each other on social media. At the time, Choi was 26 years old and working as a freelance photographer and a media and education-services consultant. Choi was also a founding, and one of the most active, members of ACN's Los Angeles chapter.

During the first few weeks of February 2019, Huang and Choi communicated frequently on social media and hung out several times in person. Huang bonded with Choi over stories about his past, including his struggles with mental health issues, drug and alcohol abuse, and "near-death experiences." Huang believed Choi was "understanding, caring, experienced in life and very reliable because his words and attitude provided [her] with comfort."

On the evening of February 18, 2019, Huang met Choi at his apartment. After talking for a while, they went to a nearby café, where they worked and studied until early the next morning. As they were leaving the café, Huang told Choi that she didn't want to return to her apartment because she felt "claustrophobic" there and had an appointment later that morning near Choi's apartment. Choi told Huang she could stay at his apartment for the rest of the morning.

When they returned to the apartment, Choi continued working while Huang used social media and talked to him about

her "personal life" and "frustrations" in her relationship with her boyfriend. After Choi finished working, he and Huang slept in his bed for a few hours. According to Huang, she was fully clothed and fell asleep on the opposite side of the bed from Choi. She later woke up to Choi "touching" and "groping" her in an inappropriate manner. She moved away from Choi and fell back to sleep, but she again woke up to him "cuddling and groping" her again without her consent. According to Choi, Huang asked him to "hug" her before they fell asleep, and they both fell asleep "embracing and hugging each other."

Around 8:00 a.m. on February 19, 2019, Choi drove Huang to her appointment. After the appointment, Huang asked Choi if she could return to his apartment because she left her keys there. Huang also offered to pick up lunch for herself and Choi on her way back. Huang dropped off the food, grabbed her keys, and left Choi's apartment.

In late February 2019, Huang spoke to Chan and two other female friends—Emily Shon and Grace Kim—about her encounter with Choi on February 18 and 19. Huang also sent Chan the following message, "Please don't tell anyone else / This is so bad ugh :( / So the day before [Choi] left for [New York] / I slept over at his house because I was studying with him and it was way too late / And we woke up cuddling. … [¶] I flirted with [Choi] as well … [I don't know] it's been f[u]cking with me / The fact that I did that and I know it's going to happen again / I'm a really needy person and like physical touch is really important to me, and this is so f[u]cking bad like. Dude, I'm going to be his neighbor in a month / And I want to f[u]cking die / because I'm literally moving like 5 min[utes] straight shot down the road and

4

I know it's gonna happen again." According to Huang, the incident with Choi "caused much confusion in [herself]."

In March 2019, Huang called Samuel Lin, another ACN member, to tell him that she broke up with her boyfriend. She explained that she ended the relationship "for [Choi]." Huang also mentioned that Choi had been "somewhat avoiding her" and that she hadn't spoken to him much lately.

Although Choi and Huang never hung out alone again, they exchanged numerous text messages between late February and early April 2019. They often discussed their social plans or talked about their struggles with stress and anxiety. They sometimes said they missed each other. In one message sent in early March 2019, after Choi told Huang he had just experienced an anxiety attack, Huang told him that she was "always here to hear [him] out and cuddle if [he] need[ed] someone." Several days later, Huang invited Choi to the same café they had worked at during the early morning hours of February 19, and she told Choi that he was welcome to sleep at her place afterwards. Choi declined Huang's offer.

In April 2019, ACN's Los Angeles chapter held an election, in which Choi ran for a leadership position. Before the election, Huang told other members of the chapter that she didn't believe Choi "was the right person to lead the organization."

On April 16, 2019, Choi was elected as the city manager of ACN's Los Angeles chapter. That same day, Chan, Shon, and a third person told Choi that Huang was spreading rumors about him. Choi then sent a text message to Huang, stating that he was "very offended" and "frustrated" that she would talk about him behind his back. Huang replied that she had "no issues" with Choi, to which he responded, "You don't have to defend yourself,

I'm just letting you know what I've heard." According to Huang, Choi started speaking "negatively" about her in their "shared social circles" after that day, claiming Huang was spreading rumors about him and "presenting [her] as if [she] was crazy."

Around May 2019, Huang moved to the Bay Area. Shortly after Huang moved, Choi sent her several text messages, all of which Huang ignored. In one message, Choi called Huang "Rude" because she wasn't responding to his messages. Several hours later, Choi told Huang that he hoped she was doing better, that he wasn't sure what she had against him, and that he hoped she could "find some peace."

## 2. Huang's Statements to ACN Leadership

On May 29, 2019, Huang sent several text messages to Justin Chang, an "administrative official" in ACN's Los Angeles chapter, complaining about Choi's behavior. Huang claimed that Choi insisted she sleep at his apartment on February 19, 2019, and that she woke up to him "spooning [her] so [she] pulled away," but a couple of hours later, she awoke to him "spooning" her again.

Huang told Chang that she contemplated killing herself on April 16, 2019, after Choi told her he was aware she had "spread rumors" about him. She was "scared" and "felt like [she] fucked up a friendship." Since then, she "distanced" herself from Choi, ignoring many of his text messages. When she did respond, she gave him "quick answers," but he continued messaging her and became "progressively more and more aggressive."

Huang claimed that Choi has engaged in a similar "pattern" with other women by "spewing lies" about them and "destroying their reputations" after he was "done" with them.

Choi made himself look "innocent" when he was the one "manipulating people into sleeping with him."

Huang told Chang that Choi's behavior "fucks [her] up because [he] is the reason why [her] 3.5 year relationship fell apart. This was a guy [she] respected and loved as a friend … This is the guy that LEADS ACN LA. The rules are MADE to protect him. This is the guy that made [her] leave a community [she] loved because [she doesn't] feel safe. This is the guy that caused [her] to go into depression and attempt suicide. And this guy is doing the exact same thing to countless other girls by using his power and position. [¶] … [¶] This guy is a leader of the LA community and he's a predator."

Huang concluded by telling Chang she felt "harassed" and "terrified of [Choi] and his potential." Huang later testified she texted Chang because of Choi's "ongoing role in ACN" and because she wanted to stop him "from taking advantage of his position to victimize more girls."

That same day (May 29), Chang spoke to Choi about Huang's allegations. Chang suggested Choi resign from his position as the city manager of ACN's Los Angeles chapter, otherwise the "matter would be opened up to the public and a deeper investigation would occur with other administrators from the organization getting involved." On May 31, 2019, Choi resigned from his role as city manager.

### 3.    Huang's Statements on Social Media

Kiana Vi Do[3] is "an Asian creative with significant Twitter and Instagram followings." In 2019, she created "an online community which provides a safe space for those who were victims of sexual abuse and assault to share their stories and experiences."

In early June 2020, Do posted a message on her Twitter account stating, "since we are all on the topic of sexual assault let's also talk about the photographers on [Instagram] who use their 'hobby' as a gateway for harassing, assaulting and manipulating girls. [¶] [I]f you would like me to add any other photographers to this thread [please] feel free to [direct message] me! … [¶] [A] large following does not always equal good intentions. [F]or all my new/current models—please stay safe and aware. [D]o your research & sadly, never go alone."

On June 5, 2020, after seeing Do's Twitter post, Huang contacted Do through a private message sent to Do's Instagram account. Huang reached out to Do because she wanted to "further the discussion" about photographers who harass, assault, and manipulate women. In her messages to Do, Huang identified Choi by his Instagram account name.

Huang explained that she had a "really bad experience" with Choi, who she blocked on all her social media accounts because she was "absolutely traumatized" and "he kept messaging [her] with no reply and got mad at [her] for not replying." Huang claimed "[t]here are other girls he's crossed boundaries/abused too. This is something [Huang] wouldn't wish

---

[3] Do is sometimes referred to as "Kianavi Do" or just "Kiana Vi" in the record.

8

upon anyone. He went private but [she] hope[d] the community [was] aware of this dangerous person."

Huang told Do that one night when she was 18 years old, Choi convinced her to stay at his place. She "woke up to him touching [her]." She "woke up twice during the night to [Choi] cuddling[,] touching[,] and groping [her] and [she] rolled away and … woke up for the day with him pressing [her] against the wall." Huang "felt so violated [and] scared [because] [she] had a boyfriend at the time and [she] was more worried that if [she] le[ft]/d[id]n't do as he say[,] [Choi] [was] going to doxx [her] or message [her] boyfriend about this incident." Huang became depressed after the incident, "dropped out of school," and "ended up moving out of Los Angeles because [she] was scared." Huang would "never forgive [Choi] for what he did to [her] and other girls too."

Huang asked Do to "post" her story about Choi on Do's Twitter account, but Huang wanted to "remain anonymous" because she was still scared of Choi, who she claimed "distanced away all [her] friends by talking shit that wasn't true at all about [her], … sen[t] really aggressive messages through Instagram if [she] didn't respond, and groped [her]."

After Do posted Huang's message on Twitter, Huang sent Do another message stating that "[s]everal other women came forward with their stories" and that ACN's Los Angeles chapter banned Choi from the organization. Huang said she "never imagined [her story] to impact this much but knowing that [they] stopped an abuser in his tracks gives [her] the closure that [she] needed."

9

## 4. Choi's Lawsuit

In August 2020, Choi sued Huang.[4] In his operative first amended complaint, Choi asserted three causes of action arising out of Huang's statements to Chang and Do:[5] (1) libel per se, (2) slander per se, and (3) false light. Choi alleged "Huang was leading a campaign to ruin [his] goodwill, name and reputation by defaming him to their mutual friends, members of ACN LA and others." Choi claimed Huang's statements ruined his professional reputation in Los Angeles, caused him to lose opportunities to work as a freelance photographer in Los Angeles, resulted in his expulsion from ACN, and caused many of his friends to "withdraw[] from him."

Huang filed a special motion to strike Choi's complaint under section 425.16, arguing her statements to Chang and Do and her Facebook post constitute protected speech. As for her statements to Chang, Huang argued they addressed issues of public interest—i.e., Choi's fitness to serve as a leader, and participate as a member, of ACN's Los Angeles chapter, "in light

---

[4] In his original complaint, Choi named another individual, Lauren Hyun, as a defendant, but he later settled his claims against her and dismissed her from his lawsuit.

[5] Choi also alleged that Huang defamed him when she posted on her Facebook account that "[a]busers need to be held accountable." As we explain below, Choi has waived any claim on appeal that the court erred in striking any of his causes of action to the extent they arise out of Huang's Facebook post by failing to address that post in his appellate briefs. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [issues not raised in appellant's brief are deemed waived or abandoned].)

10

of his treatment of women and his abuse of authority and respect within the community." Huang also argued her statements to Do addressed issues of public interest and were made in a public forum—i.e., through social media sites on the internet. Specifically, her statements to Do were made as part of a "public discussion" addressing photographers on Instagram who use their jobs and hobbies to prey on, and assault, young women. Additionally, her statements to Do were made against the backdrop of the "#MeToo" movement and were intended to "further discussions concerning … abuse of power."

Addressing the second prong of the anti-SLAPP statute, Huang argued Choi couldn't show a probability of prevailing on the merits of any of his claims because none of her statements were false. In any event, Huang argued, Choi's claims arising out of her statements to Chang were time-barred because Choi did not file his original complaint until more than a year after those statements were made.

Choi opposed Huang's motion. He argued none of Huang's statements were entitled to anti-SLAPP protection because they concerned a private dispute between Huang and Choi. In Choi's view, he wasn't a person in the " 'public eye' " and his "everyday actions pose[d] no significance to the general public." Choi also claimed Huang's statements did not concern or affect " 'large numbers of people' " because Huang published most of her statements to only two individuals—Chang and Do—and she asked Do to keep many of the most sensitive statements private. As to the anti-SLAPP statute's second prong, Choi argued all his claims have minimal merit because Huang's statements were provably false and not subject to any privilege.

11

In support of his opposition, Choi filed objections to Huang's supporting evidence, including declarations filed by Huang and her lawyer.

On March 30, 2021, Huang filed her reply. In support of her reply, Huang submitted declarations executed by Chang and Lauren Hyun.

On April 1, 2021, Choi filed objections to Chang's and Hyun's declarations, arguing, among other things, that Huang was precluded from submitting new evidence with her reply papers. Choi also objected to portions of Huang's reply brief.

The next day, on April 2, Huang filed objections to Choi's evidence supporting his opposition.

The court issued a tentative ruling dated April 6, 2021, indicating it intended to deny Huang's anti-SLAPP motion. That same day—April 6—the court heard argument on the motion and took the matter under submission.

On April 16, 2021, the court issued a written ruling granting Huang's anti-SLAPP motion in its entirety. The court sustained 11 of Choi's objections to Huang's evidence, including one objection to her lawyer's declaration and 10 objections to her declaration. The court also excluded Chang's and Hyun's declarations. The court overruled Choi's remaining objections. The court sustained 108 of Huang's 116 objections, including all of her objections to declarations executed by Choi, Chan, Crystal Duan, and Lin, and overruled her objections to declarations executed by Do and Choi's lawyer.

As to the first prong of the anti-SLAPP statute, the court found all of Choi's claims arise out of protected activity. As to the second prong, the court found Choi failed to show any of his claims have minimal merit. Specifically, the court found Choi's

12

claims are time-barred to the extent they arise out of Huang's statements to Chang, since Choi filed his original complaint more than a year after those statements were made. The court also found Choi failed to present any evidence to support a finding that the running of the statute of limitations was delayed under the discovery rule. With respect to Choi's claims arising out of Huang's statements to Do, the court found those statements were protected under the common interest privilege (see Civ. Code, § 47, subd. (c)), and Choi failed to overcome that privilege because he didn't present "sufficient admissible evidence" to support a finding that Huang made the statements with actual malice.

Choi timely appealed from the order granting Huang's anti-SLAPP motion.

## DISCUSSION

Under the anti-SLAPP statute, a defendant may move to strike claims arising from certain free speech or petitioning activity. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) The statute creates a two-step process through which the moving defendant must first show the challenged causes of action arise from protected activity, meaning "any act … in furtherance of the [defendant's] right of petition or free speech … in connection with a public issue." (§ 425.16, subd. (b)(1).) To determine whether the plaintiff's causes of action arise from protected activity, we look at the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If the defendant succeeds at the first step, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged causes of action, otherwise the court must strike those

13

claims. (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619–620.)

We independently review an order granting a special motion to strike under section 425.16. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672.) " ' "[W]e engage in the same, two-step process as the trial court to determine if the parties have satisfied their respective burdens. [Citations.] If the defendant fails to show that the lawsuit arises from protected activity, we affirm the trial court's ruling and need not address the merits of the case under the second prong of the statute." ' [Citation.]" (*Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1298.)

### 1. Huang's Statements Giving Rise to Choi's Claims

As a preliminary matter, we identify which of Huang's statements are at issue in this appeal. The only allegedly defamatory statements identified in Choi's first amended complaint are Huang's May 2019 statements to Chang, her June 2020 statements to Do, and her Facebook post. In its written ruling, the court found Choi's causes of action were based only on Huang's statements to Chang and Do. Choi doesn't address Huang's Facebook post on appeal, and although he asserts in passing in his opening brief that Huang defamed him through statements she made to other individuals, he doesn't develop any argument explaining how the court erred in concluding his claims arise only out of Huang's statements to Chang and Do. Consequently, Choi has waived any argument that the court should not have dismissed his libel, slander, and false light claims to the extent they arose out of statements other than Huang's May 2019 statements to Chang and her June 2020 statements to Do. (See *Landry v. Berryessa Union School Dist.*

14

(1995) 39 Cal.App.4th 691, 699–700 [issues that are not supported by pertinent or cognizable legal argument may be deemed abandoned].)

## 2. Protected Activity Under Section 425.16, subdivisions (e)(3) and (e)(4)

Huang argues her statements to Chang and Do fall within the last two categories of protected speech identified in section 425.16, subdivision (e), which protect statements made "in connection with" an issue of public interest. Specifically, subdivision (e)(3) protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) And subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or any issue of public interest." (*Id.*, subd. (e)(4).)

In *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*), the California Supreme Court articulated a two-step test to determine whether speech or conduct was made in connection with an issue of public interest. Under the first step, the challenged speech or conduct must implicate a public issue or a matter of public interest. (*Id.* at p. 149.) Under the second step, the speech or conduct must have been made "in connection with" a public issue or a matter of public interest. (*Ibid.*)

To determine whether speech or conduct implicates a public issue or a matter of public interest under *FilmOn*'s first step, courts look to "certain specific considerations." (*FilmOn, supra,* 7 Cal.5th at p. 145.) Those considerations include whether "the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the

15

direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*Id*. at pp. 145–146.)

The Supreme Court recently clarified the standard for determining whether speech or conduct satisfies *FilmOn*'s first step in *Geiser v. Kuhns* (2022) 13 Cal.5th 1238 (*Geiser*). The Court explained that the first step "calls for an objective inquiry, without deference to the [defendant's] framing or personal motivations." (*Id*. at p. 1254.) Thus, "[a] court evaluating an anti-SLAPP motion should take the position of a reasonable, objective observer." (*Ibid*.) The first step is met "so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute. Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does an anti-SLAPP motion fail at [the] first step." (*Id*. at pp. 1253–1254.) "If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step." (*Id*., at p. 1254.)

As for *FilmOn*'s second step, courts apply a two-part test to determine whether speech or conduct was made "in connection with" an issue of public interest. (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) "First we ask what 'public issue or … issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id*. at pp. 149–150.) The second part of this test "address[es] the specific

16

nature of [the defendant's] speech and its relationship to the matters of public interest." (*Id*. at p. 152.)

Under *FilmOn*'s standard, " 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*FilmOn, supra*, 7 Cal.5th at p. 150.) "What it means to 'contribute to the public debate' [citation] will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id*. at pp. 150–151.)

Because Huang's statements to Chang and Do were made at different times and in different contexts, we address them separately. (See *Geiser, supra*, 13 Cal.5th at pp. 1252–1253 [the context surrounding the challenged speech or conduct is a key consideration in determining whether that speech or conduct implicates a matter of public interest].)

### 2.1.  Huang's Statements to Chang

Huang's May 2019 messages to Chang were not made in a place open to the public or in a public forum. Rather, they were private communications between Huang and Chang. Thus, to qualify for protection under the anti-SLAPP statute, Huang's statements must fall within section 425.16, subdivision (e)(4). (See *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1467 (*Ruiz*) [section 425.16, subdivision (e)(4)

17

" 'governs even private communications, so long as they concern a public issue' "].) The first issue for us to decide, then, is whether those statements implicate a matter of public interest. (See *Geiser*, *supra*, 13 Cal.5th at p. 1253.) We conclude they do.

ACN's Los Angeles chapter is a Facebook group and networking organization for young Asian creatives. When Huang sent her messages to Chang in May 2019, the Los Angeles chapter had between 1,000 and 4,000 members, and the entire ACN organization had about 45,000 members throughout the nation. At that time, Choi was the city manager of the Los Angeles chapter and one of its founding and most active members. Chang was one of the chapter's "administrative official[s]." Huang told Chang, among other things, that Choi was a "predator" who uses his "power and position" as a "leader of the LA community" to "spew[] lies" about other women, "destroy[] their reputation[s]," and "manipulat[e them] into sleeping with him."

Huang's statements to Chang include criticisms of Choi's fitness to represent ACN's Los Angeles chapter and accusations that one of the chapter's elected leaders used his position to prey sexually on women, including other members of the chapter. Certainly, the chapter's approximately 1,000 to 4,000 members would be concerned about such allegations. (See *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [statements addressing who should lead a homeowner association were of public interest to association members because "they concerned the very manner in which th[e] group of more than 3,000 individuals would be governed"].) Huang's statements, therefore, concerned issues that "could directly affect a large number of people beyond the direct participants" of Huang's

messages to Chang, a factor supporting a finding that Huang's statements implicated a public issue. (*Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

Huang's statements to Chang also occurred in the context of an ongoing controversy, dispute, or discussion. (See *FilmOn*, *supra*, 7 Cal.5th at p. 145; see also *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 [where the asserted issue is of interest "to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion"].) In April 2019, Choi was elected to be the city manager of ACN's Los Angeles chapter. Shortly before the election, Huang told other chapter members that she didn't believe Choi "was the right person to lead the organization." As Choi testified in his declaration, Huang's statements spread throughout the chapter and eventually reached Choi, who confronted Huang about them. Thus, by the time Huang sent her messages to Chang, Choi's fitness to represent the Los Angeles chapter was a topic of dispute within the chapter.

As for *FilmOn*'s second step, Huang's statements to Chang were made "in connection" with an issue of public interest. Huang testified that she reached out to Chang because of Choi's "ongoing role in ACN" and because she wanted to prevent Choi "from taking advantage of his position to victimize more girls." Thus, through her statements to Chang, Huang "contributed" to the public debate by furthering the discourse on Choi's fitness to continue to serve as a representative of ACN's Los Angeles chapter. (*FilmOn, supra*, 7 Cal.5th at pp. 150–151.) Huang's

19

statements also had a direct effect on Choi's leadership role within ACN's Los Angeles chapter. In his declaration, Choi testified that he spoke to Chang the same day Huang made her challenged statements. During that conversation, Chang asked Choi to resign from his position as city manager of ACN's Los Angeles chapter in light of Huang's allegations, which Choi agreed to do. Chang also stated that if Choi did not resign, Huang's allegations "would be opened up to the public and a deeper investigation would occur with other administrators from [ACN's Los Angeles chapter] getting involved."

Choi contends Huang's statements to Chang are not entitled to anti-SLAPP protection because they concern a private dispute between Huang and Choi. In Choi's view, Huang's statements amount to nothing more than Huang retaliating against him because he rejected her romantic advances. This argument lacks merit. While Huang's statements to Chang undoubtedly address a private dispute between Huang and Choi over what transpired during their February 2019 encounter at Choi's apartment and their ensuing relationship, they also touch on issues of public interest—i.e., Choi's fitness to represent ACN's Los Angeles chapter and allegations that he used his position of power within the chapter to prey sexually on women. As our Supreme Court explained in *Geiser*, speech satisfies *FilmOn*'s first step when it implicates a public issue, even it if also implicates a private dispute. (*Geiser*, *supra*, 13 Cal.5th at p. 1253; see e.g., *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1361, 1366–1367 (*Wong*) [parent's negative review of dentist was protected activity because it touched on the public issue of safe dental practices, even though the review also addressed the parent's private dispute with the dentist].)

Choi also argues Huang's statements to Chang do not implicate a matter of public interest because ACN is merely an online social network and not a professional organization. Choi argues this distinction is important because it means he did not owe any fiduciary or ethical duties to the members of ACN's Los Angeles chapter, and he lacked any power to "make binding decisions on behalf of their members." Assuming Choi's characterization of the nature of his role within the ACN's Los Angeles chapter is accurate, we fail to see the significance of this distinction for purposes of the anti-SLAPP statute. Choi was elected by the Los Angeles chapter's members to represent the chapter as its city manager. It is reasonable to assume, then, that the chapter's sizable membership base was interested in Choi and would be concerned about allegations that one of its elected representatives was using his status within the chapter to prey sexually on women, including chapter members, even if Choi did not have the power to make binding decisions for the chapter.

### 2.2. Huang's Statements to Do

The court found Huang's June 2020 statements to Do were made in a public forum—i.e., Do published Huang's statements, at Huang's request, on Do's public Twitter thread. (See *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1252 [websites accessible to the public are "public forums" under the anti-SLAPP statute].) Choi contends the statements were not made in a public forum because Huang sent them as private messages to Do before Do published them on Twitter. Thus, Choi argues, subdivision (e)(4), and not subdivision (e)(3), of section 425.16 applies to our analysis of whether Huang's statements to Do are protected speech. We need not resolve this dispute because, even if we were to assume subdivision (e)(4) applies, Huang's statements to Do

21

qualify for protection because they were made in connection with an issue of public interest. (*Ruiz, supra,* 134 Cal.App.4th at p. 1467 [subdivision (e)(4) " 'is intended to cover private communications on public issues' "].)

At the time Huang messaged Do about her experience with Choi, Do was a social media personality with "significant Twitter and Instagram followings" who had cultivated an "online community" that provides "a safe space" for "victims of sexual abuse and assault to share their stories and experiences." Do had recently started a public discussion on her Twitter account addressing photographers who use their work to assault, harass, and manipulate women. As part of that discussion, Do asked other women to share their stories about photographers on Instagram who use their photography as a "gateway" to target women. Do offered to post those stories in her public Twitter thread. Huang responded to Do's post because she wanted to "further the discussion" that Do had started.

The issue of photographers using their "hobby" or work to assault, harass, and manipulate women is a matter of interest to the public, especially the modeling and photography communities. (See *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 382 [statements that implicate issues "concerning the protection of people" would be "of interest to most people," especially those who would most likely be affected by the public safety issue]; see also *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 277–278 [state laws prohibiting sexual harassment in the workplace reflect "public policy" in favor of protecting the right to a safe workplace].) Although Huang's statements to Do touched on Huang's private dispute with Choi, much in the same way her statements to Chang did, they also address this public

issue. (*Geiser*, *supra*, 13 Cal.5th at p. 1253.) Specifically, Huang told Do that Choi was a photographer who had "crossed boundaries" with, and "abused," other women, and that Choi's conduct is not something she would "wish upon anyone." Huang also stated she hoped the "community" was "aware of this dangerous person" and that she was "tired of [Choi] using 'photography' as a way to get with really young models and then tak[e] advantage of them."

Further, Huang's statements were made in connection with an issue of public interest. As we just explained, Huang responded to Do's public discussion on Twitter about photographers using their work to prey on women. Although Huang sent her messages privately to Do, she asked Do to post her messages publicly on Twitter, which Do did. Thus, Huang's statements to Do contributed to the public discussion of photographers using their work to assault and harass women. (*FilmOn*, *supra*, 7 Cal.5th at pp. 150–151 [a defendant speaks "in connection with" an issue of public interest if she "participate[s] in, or further[s], the discourse that makes an issue one of public interest"].)

Choi argues Huang's messages to Do don't implicate a matter of public interest because Huang asked Do to keep Huang's messages anonymous, a request Do honored. But Choi fails to explain how Do posting Huang's messages while keeping Huang's identity a secret would strip Huang's statements of protection under the anti-SLAPP statute. Indeed, under the facts of this case, it is the content of Huang's messages—i.e., her statements addressing photographers using their work to prey on women—not her identity, that implicates the public interest.

23

Choi also contends Huang's statements aren't protected because Choi never photographed Huang as a model. This argument also lacks merit. While Huang may not have modeled for Choi, her statements address Choi using his photography work to cross boundaries with, take advantage of, and abuse other women, which, as we just explained, implicates a matter of public interest.

### 2.3. Conclusion

In sum, because Huang's statements to Chang and Do implicate issues of public interest and were made in connection with those issues, they are entitled to protection under the first prong of the anti-SLAPP statute.

### 3. Evidentiary Rulings

Before reaching the court's ruling on the second prong of the anti-SLAPP statute, we address Choi's challenges to the court's evidentiary rulings. Choi contends the court erred in sustaining Huang's objections to his evidence because: (1) Huang did not timely file her objections; and (2) it was a manifest abuse of discretion for the court to sustain more than 100 of Huang's 116 objections. We conclude Choi has failed to show the court abused its discretion in ruling on Huang's objections or that any purported error was prejudicial.

### 3.1. Standard of Review

We review a trial court's rulings on evidentiary objections under an abuse of discretion standard. (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447 (*Palms*).) We will not reverse a court's order because of an erroneous evidentiary ruling unless the appealing party

establishes there is a reasonable probability he would have obtained a more favorable result but for the error. (*Id.* at p. 1449.)

### 3.2.   Timeliness of Huang's Objections

Choi argues the court should have disregarded Huang's objections because they were not timely filed. We disagree.

Huang filed her reply on March 30, 2021, and she filed her objections three days later, on April 2. The court heard argument on Huang's anti-SLAPP motion on April 6.

Choi argues Huang's objections were untimely because they were not filed at the same time she filed her other reply papers. Choi does not cite to any authority discussing when a party must file objections in connection with anti-SLAPP motions. Instead, he relies on California Rules of Court, rule 3.1354 (Rule 3.1354), which provides that unless otherwise excused by the court on a showing of good cause, "all written objections to evidence in support of or in opposition to a motion for summary judgment or summary adjudication must be served and filed at the same time as the objecting party's opposition or reply papers are served and filed." But Rule 3.1354 applies on its face only to objections filed in connection with a summary judgment or summary adjudication motion. Nothing in that rule of court states that it applies to anti-SLAPP motions, and Choi doesn't cite to any cases or other authority holding the rule governs the filing of objections in connection with such motions.

To be sure, Choi argues we should nevertheless apply Rule 3.1354 because courts "have borrowed certain procedures applicable to summary judgment motions in Anti-SLAPP cases." However, he fails to address the California Supreme Court's holding in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, which explains that "written evidentiary objections made *before* [a

25

summary judgment] hearing, as well as oral objections made at the hearing are deemed made 'at the hearing' under section 437c, subdivisions (b)(5) and (d), so that either method of objection avoids waiver." (*Id.* at pp. 531–532.) Thus, even if summary judgment procedures govern our evaluation of the timeliness of objections filed in connection with anti-SLAPP motions, Huang's objections were timely under *Reid*'s interpretation of section 437c, since the objections were filed four days before the hearing on her motion. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [the decisions of the Supreme Court are binding on, and must be followed by, all state courts of California].)

In any event, Choi fails to explain how he was prejudiced by the court's consideration of any untimely objections. (*Palms*, *supra*, 210 Cal.App.4th at p. 1449.) As we just noted, Huang filed her objections four days before the hearing on her anti-SLAPP motion. Yet Choi did not raise any timeliness challenge to those objections at the hearing, and he does not claim on appeal that he lacked an opportunity to oppose Huang's objections because they were not filed at the same time as her other reply papers.

### 3.3. Merits of the Evidentiary Rulings

Choi also contends the court erred by sustaining more than 100 of Huang's 116 objections. Specifically, Choi argues it was a manifest abuse of discretion for the court to sustain such a high volume of objections. (See *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 254–256; *Palms*, *supra*, 210 Cal.App.4th at pp. 1447–1449.) As we explain, Choi has forfeited his challenges to the merits of the court's evidentiary rulings.

In his opening brief, Choi does not address any particular objection from Huang, aside from one, that he believes the court

erred in sustaining. To "not belabor the record," Choi opts to argue generally that the court erred in sustaining "objections to critical evidence [in his declaration], which was admissible on its face." Choi fails, however, to point to which objections targeted statements in his declaration that were admissible. Instead, he asks us to parse Huang's objections and his declaration, assuring us that "[i]f [we] read[] [his] declaration, it will become readily apparent that his first-hand account of events that took place, including his communications with Huang, are fundamentally admissible as both present sense impressions, past recollections recorded, verbal acts, and opposing admissions." That is not, however, our responsibility. (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455 [the appellant must support claims of error with citations to the record and pertinent legal authority, and the court has no obligation "to cull the record" for the appellant's benefit].)

Regardless, we have reviewed Choi's declaration, and it is riddled with inadmissible statements. For example, the court properly sustained Huang's objection to Choi's statement that he "speculated that Huang was simply seeking for [him] to leave the community that she was no longer a part of since she no longer lived in Los Angeles," on the grounds that such statement was, in Choi's own words, speculation. (See *Sweetwater Unions High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 947 ["speculative" evidence should be excluded when considering the second prong of the anti-SLAPP statute].) Likewise, the court properly excluded as speculation (and irrelevant) Choi's statement that he "thought [Huang] was emotional and mad at [him] for not returning her romantic advances as shown in the messages to her." The court also properly sustained Huang's

27

objection to Choi's statement that he "recognized [Huang's] 'hyperventilating' as a sign of obsessive anxiety of the fear of being rejected," because such statement was irrelevant, constituted improper opinion by Choi, and lacked any foundation for Choi's opinion. (See *ibid.*)

As for the one objection from Huang that Choi does address, he has not shown the court erred in sustaining it. Huang objected to part of Choi's declaration in which he quoted the content of some of the messages Huang sent to Do in June 2020. Choi argues the court erred in sustaining the objection because Huang only objected to the quoted messages on hearsay, foundation, and authentication grounds, none of which could apply to messages sent by Huang. Even if we were to assume Huang's objection lacked merit, the quoted messages to which Huang objected were already admitted through other sources and considered by the court in its ruling on Huang's anti-SLAPP motion. In other words, Choi's transcription of the messages in his declaration was cumulative of other evidence already before the court. Choi, therefore, hasn't shown the court erred in sustaining Huang's objection or, more importantly, that he was harmed by that ruling. (See *People ex rel. Department of Public Works v. Donovan* (1962) 57 Cal.2d 346, 357 [where evidence is "merely cumulative," there "is no abuse of discretion in disallowing it"]; *Palms*, *supra*, 210 Cal.App.4th at p. 1449 [appellant must show how he was prejudiced by challenged evidentiary ruling].)

In short, aside from addressing the one objection we just discussed, Choi has not developed any meaningful argument demonstrating how the court erred in sustaining Huang's evidentiary objections. Choi also makes only a generalized

28

argument that he was prejudiced by the court's evidentiary rulings, without explaining how he was prejudiced by the exclusion of any specific evidence. Choi, therefore, has not shown the court's rulings sustaining Huang's evidentiary objections were an abuse of discretion or otherwise warrant reversal of the order sustaining Huang's anti-SLAPP motion. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656 (*Keyes*) [an appellant forfeits any points that are not properly raised or that are not supported by cognizable legal argument and factual analysis]; *Palms*, *supra*, 210 Cal.App.4th at p. 1449.)

### 4.      Probability of Prevailing

Choi next contends the court erred in finding he wasn't likely to prevail on any of his causes of action. As we discuss below, the court properly found Choi's claims lack minimal merit.

If the defendant establishes the plaintiff's claims arise out of protected activity, the plaintiff must demonstrate a probability of prevailing on his claims. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) To do so, the plaintiff must make a prima facie showing of facts to sustain a favorable judgment. (*Wong*, *supra*, 189 Cal.App.4th at p. 1368.) As part of his burden, the plaintiff must present evidence that would be admissible at trial and cannot rely "on the allegations in the complaint or assertions in a declaration based on information and belief." (*Ibid*.)

For the second prong, the court conducts an analysis akin to evaluating a summary judgment motion. (*Baral*, *supra*, 1 Cal.5th at p. 384.) "The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [The court] accepts the plaintiff's evidence as true, and evaluates

29

the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Id.* at pp. 384–385.) If the plaintiff makes a prima facie showing of a likelihood of success, the court should deny the anti-SLAPP motion unless, as a matter of law, the defendant's evidence defeats the plaintiff's claim. (*Wong*, *supra*, 189 Cal.App.4th at p. 1368.)

### 4.1. General Legal Principles of Libel, Slander, and False Light

Defamation comes in two forms: libel and slander. (Civ. Code, § 44.) Libel arises out of written publications or "other fixed representation[s]." (*Id.*, § 45.) Slander arises out of, among other things, oral statements. (*Id.*, § 46.) The elements of a defamation claim are: (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or that causes special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720 (*Taus*).) A defamatory statement is "published" when it is made to at least one third person. (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 884 (*Medical Marijuana*); see also *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242 (*Shively*) [a "written dissemination" is not required for a statement to be "published" for purposes of defamation].)

A false light claim is a species of invasion of privacy and arises out of " 'publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1264.) In substance, a false light claim is the same as a libel claim and subject to the same requirements. (*Ibid.*) Thus, " '[w]hen a false light claim is

coupled with a defamation claim, the false light claim is …
superfluous, and stands or falls on whether it meets the same
requirements as the defamation cause of action." (*Ibid*.)

### 4.2. Choi's causes of action arising out of Huang's statements to Chang are time-barred.

Choi contends the court erred in finding all his claims
arising out of Huang's statements to Chang are barred by the one
year statute of limitations applicable to defamation and false
light claims. We disagree.

Causes of action for libel and slander are subject to a one-
year statute of limitations. (Code Civ. Proc., § 340, subd. (c)
[defamation claims].) Choi concedes his false light claim is also
subject to a one-year statute of limitations. (*Maheu v. CBS, Inc.*
(1988) 201 Cal.App.3d 662, 676 [invasion of privacy claims].) The
statute of limitations begins to run when the challenged
statement is published to a third party or, in certain cases, when
the plaintiff discovered, or reasonably should have discovered or
suspected, the factual basis for his claim. (*Shively, supra*, 31
Cal.4th at pp. 1247–1248.)

Huang's statements to Chang that give rise to Choi's libel,
slander, and false light claims were published on May 29, 2019—
i.e., the date Huang made the statements to Chang.[6] (See
*Medical Marijuana, supra*, 46 Cal.App.5th at p. 884.) Thus, the
statute of limitations for Choi's claims arising out of Huang's
statements to Chang began to run on May 29, 2019. Choi did not
file his original complaint, however, until August 14, 2020. Choi's

---

[6] In his appellate briefs, Choi doesn't dispute that all his claims were
based on Huang's statements to Chang that were published on May 29,
2019.

31

claims based on Huang's statements to Chang are therefore time-barred.

Choi argues, however, that the statute of limitations for those claims did not begin to run until at least August 22, 2019, the date he discovered the content of Huang's text messages to Chang. We are not persuaded.

Under the discovery rule, the accrual of a cause of action is delayed until the plaintiff "discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) A plaintiff has reason to discover a cause of action when he " 'has reason to at least suspect a factual basis for its elements.' " (*Ibid.*)

Courts don't take a "hypertechnical approach" when applying the discovery rule. (*Fox, supra*, 35 Cal.4th at p. 807.) Rather than determining whether the plaintiff suspects facts supporting each "specific legal element" of a particular cause of action, we look to whether the plaintiff has reason to at least suspect the " 'generic' elements of wrongdoing, causation, and harm." (*Ibid.*) In other words, a cause of action accrues when the plaintiff "at least 'suspects … that someone has done something wrong' to him [citation], [with] 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]." (*Norgart v. Upjohn* Co. (1999) 21 Cal.4th 383, 397–398.) To apply the discovery rule, the plaintiff must conduct a "reasonable investigation" once he becomes aware someone has injured him, and he is "charged with knowledge of the information that would have been revealed by such an investigation." (*Fox, supra*, 35 Cal.4th at p. 808; see also *Norgart*, at p. 398 [once the plaintiff has "reasons to suspect" he has been

wronged, he must "seek to learn the facts necessary to bring the cause of action"].)

The discovery rule typically does not apply to defamatory statements published in books, newspapers, magazines, or other similar sources. (*Shively*, *supra*, 31 Cal.4th at p. 1250.) But it may apply in cases where it is "particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand," such as statements communicated in confidence to a third party. (*Id.* at pp. 1248, 1250–1251.)

The court correctly found the discovery rule does not apply in this case. In his declaration supporting his anti-SLAPP opposition, Choi testified that Chang contacted him to discuss Huang's statements on May 29, 2019, the same day Huang communicated with Chang. According to Choi's declaration, "Chang contacted [Choi] and [they] had a call about Huang's May 29, 2019 statement in or about May 29, 2019. During this call, Chang told [Choi] that Huang told [Chang that Choi] had 'spooned' [Huang] on February 18, 2019." During that same call, Chang suggested that Choi resign from his position at ACN's Los Angeles chapter or else the "matter would be opened up to the public and deeper investigation would occur with other administrators from [ACN] getting involved." Choi also testified that he agreed to resign because he "didn't want [the] situation to escalate due to the fear of what Huang could do to change the narrative, despite knowing [he] did nothing wrong."

Choi's declaration, therefore, establishes that he was aware Huang harmed him through her statements to Chang. While Choi may not have known the exact content of Huang's

statements, it was more than reasonable for the court to infer he was aware that she accused him of wrongdoing, otherwise he would not have agreed to resign from his position in ACN's Los Angeles chapter or had reason to be concerned that Huang could further "escalate" the situation. Because Choi points to no evidence showing he investigated the content of Huang's statements once he spoke to Chang on May 29, 2019 or that he would not have been able to discover the content of Huang's statements had he conducted such an investigation, the discovery rule did not delay the accrual of Choi's claims to the extent they arise out of Huang's statements to Chang. (*Fox*, *supra*, 35 Cal.4th at p. 808.)

### 4.3. Choi has not shown the court erred in finding his claims arising out of Huang's statements to Do lack merit.

The court found Choi did not demonstrate a likelihood of prevailing on his libel, slander, and false light claims because Huang presented evidence that her statements to Do were protected under the common interest privilege and Choi failed to present prima facie evidence that Huang made her statements with actual malice so as to overcome the privilege. As we explain, Choi has failed to show this ruling was erroneous.

To qualify as libel or slander, a challenged statement must be unprivileged. (Civ. Code, §§ 45 & 46.) Under Civil Code section 47, subdivision (c), the common interest privilege applies to statements made without malice to a person who shares a common interest with the speaker in the statements' subject matter. (*Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1177.)

A defendant bears the initial burden of showing her allegedly defamatory statements were privileged. (*Hui v.*

*Sturbaum* (2014) 222 Cal.App.4th 1109, 1119 (*Hui*).) If the defendant meets that burden, the plaintiff must make a prima facie showing that the defendant made her statements with actual malice. (*Ibid.*) Actual malice is established by a showing that the statements were motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds to believe her statements were true and acted in reckless disregard of the plaintiff's rights. (*Taus*, *supra*, 40 Cal.4th at pp. 781–782.)

As we noted above, Do testified that she created "an online community which provides a safe space for those who were victims of sexual abuse and assault to share their stories and experiences." Do also posted publicly on Twitter, soliciting stories from women who have been victims of sexual abuse or harassment perpetrated by photographers. Huang responded to Do's post because she wanted to "further the discussion" of sexual abuse permeating the photography community. Huang, therefore, presented prima facie evidence that she and Do shared a common interest in the subject matter of her statements—i.e., photographers using their work to target, or take advantage of, women.

Choi does not make a meaningful effort to challenge the court's finding that Huang and Do shared a common interest in Huang's statements about Choi for purposes of the common interest privilege. Instead, he argues that Do never requested from Huang the information shared in Huang's statements. This argument is misguided because, as we've explained, Do did ask women to share their experiences with problematic photographers, and Huang specifically responded to that request.

35

Choi also argues the privilege shouldn't apply because Do should have been suspicious of Huang's statements after Huang asked to remain anonymous. Choi does not cite any legal authority to support this argument, and we don't see the merits of it. There are legitimate reasons alleged victims of sexual misconduct may wish to remain anonymous when accusing a person of misconduct. Doing so does not, by itself, render the alleged victim's accusation "suspicious."

Because Choi has not shown the court erred in finding Huang made a prima facie showing that her statements to Do were privileged, the burden shifted to him to make a prima facie showing that Huang made her statements with malice. (*Hui*, *supra*, 222 Cal.App.4th at p. 1119.) The court found Choi failed to meet that burden, and Choi has not shown on appeal that the court's finding was erroneous.

In his opening brief, Choi makes only conclusory assertions that Huang acted with malice when she made her statements to Do. For instance, Choi asserts that "Huang **had to know** her statements were false as she and Choi were the only two people present at Choi's apartment on February 18, 2019, and Huang admitted multiple times that they just cuddled." Choi also asserts that he "presented a timeline of a changing narrative by Huang which constitutes circumstantial evidence (at a minimum), as well as some direct evidence by third party witnesses, that Huang's **real** motivation was revenge for being spurned." And Choi claims that "Huang could not have acted with reasonable care in making these statements, as she was a party to the events and thus it must be concluded as a matter of law that she knew they were false when making them."

Choi fails, however, to support these assertions with citations to any admissible evidence in the record that supports them. This omission is fatal here because, as we explained above, the court excluded large portions of Choi's supporting evidence, and his argument appears to refer to some of the excluded statements from his declaration addressing Huang's motives. Choi has not shown the court erred in excluding that evidence, and he points to no other, admissible evidence to support his assertions that Huang acted with malice when she made her statements to Do. Choi has, therefore, failed to show the court erred in finding he did not produce sufficient evidence of malice to rebut Huang's showing that her statements to Do are protected by the common interest privilege. (*Keyes*, *supra*, 189 Cal.App.4th at pp. 655–656.)

## DISPOSITION

The order granting Huang's anti-SLAPP motion is affirmed. Huang shall recover her costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


ADAMS, J.

38